# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DERRICK EDWARDS,              )
                                 )
              Plaintiff,    )
                                 )    **CIVIL ACTION**
v.                             )
                                 )    **No. 13-1399-JWL**
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,    )
                                 )
              Defendant.    )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Social Security Disability (SSD) benefits under sections 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error in the Commissioner's decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING it.

## I.    Background

Plaintiff applied for SSD, alleging disability beginning March 15, 2008. (R. 12, 117-18). Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. He claims the Administrative Law Judge (ALJ) erred in failing to provided a proper narrative discussion which adequately

explained his residual functional capacity (RFC) assessment as required by Social

Security Ruling (SSR) 96-8p.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052

(10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he

findings of the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual

findings are supported by substantial evidence in the record and whether he applied the

correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord,

White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than

a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S.

389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804

(10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that

of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting

Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the

determination whether substantial evidence supports the Commissioner's decision is not

simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by

other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v.

Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the

3

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court finds no error in the ALJ's narrative discussion regarding her RFC

assessment.

## II.     The Parties' Arguments

Plaintiff claims the ALJ failed to explain how she arrived at her RFC conclusions.

He argues that the only medical opinions regarding Plaintiff's capabilities are those of the

non-examining state agency doctors, that their opinions were formed based on a review of

the record evidence in May 2011 before Plaintiff had various surgeries for ischemia in his

right leg and compartment syndrome of the right calf, and before he developed right foot

drop, and that the ALJ failed to explain how Plaintiff's peripheral artery disease (PAD)

and right foot drop were considered and resolved in her narrative discussion.  He claims

that the standing and/or walking limitations assessed are not supported by substantial

record evidence.  Plaintiff points to treatment notes indicating home health care, extended

wound care after surgery for compartment syndrome, need for an assistive device during

recovery from the surgery, and reports of malaise, fatigue, weight loss, claudication,

shortness of breath, and joint pain, as record evidence contrary to the RFC assessed.

The Commissioner argues that the ALJ's entire RFC analysis is the narrative

discussion required by SSR 96-8p, and that the discussion meets the requirements of that

ruling and is supported by the record evidence.  She notes that the ALJ found Plaintiff's

allegations of symptoms resulting from his impairments are not credible, and she argues

that the sit/stand option and the postural limitations assessed by the ALJ constitute greater limitations than opined by any medical source and, therefore, any error in assessing such restrictions operates in Plaintiff's favor, and is harmless.  She argues that the ALJ properly discussed the evidence relating to Plaintiff's PAD and compartment syndrome.

In his reply brief, Plaintiff cites the case of Luzier v. Astrue, No 10-1186-JWL, 2011 WL 2470243, *4 (D. Kan. June 20, 2011) for the proposition that a Social Security decision must explain how ambiguities were resolved, and he argues that in this case "the ALJ did not explain how [Mr.] Edward's peripheral artery disease and right foot drop were considered and resolved."  (Reply 2).  He argues that the record contains evidence that Plaintiff has limitations resulting from PAD and right foot drop that are greater than those assessed by the ALJ.

III.   **Analysis**

The court agrees with the Commissioner that the ALJ provided a narrative discussion adequately explaining her assessment of Plaintiff's RFC in the case at bar. Much of Plaintiff's argument ignores that it is Plaintiff's burden in a Social Security case to prove that he has a physical and/or mental impairment which prevents performance of any substantial gainful activity, it is not the Commissioner's burden to prove that Plaintiff has the ability to work.  42 U.S.C. § 423(d) (defining disability as inability to engage in any substantial gainful activity).  Although Plaintiff is correct that SSR 96-8p requires an ALJ to include an explanation how any ambiguities and material inconsistencies in the evidence were considered and resolved, Plaintiff points to no ambiguities or material

5

inconsistencies in this record which were not considered and resolved.  Plaintiff argues

that the ALJ should have explained why she assessed postural and environmental

limitations, why she assessed a need to alternate sitting and standing every 30 minutes,

and why she determined Plaintiff could stand and/or walk six hours in a workday.  But,

Plaintiff points to no record evidence which would preclude such limitations.

Plaintiff argues that "the ALJ did not explain how [Mr.] Edward's peripheral

artery disease and right foot drop were considered and resolved" (Reply 2), but he does

not explain what it is about those impairments that is ambiguous or materially

inconsistent and in need of resolution.  At step two of her analysis, the ALJ summarized

the history and treatment of those impairments--noting home health care, aggressive

wound care, and skin graft.  (R. 14-15).  She noted that in December 2011 Plaintiff

"reported that the wound was healing well."  (R. 15) (citing Ex. 8F/1-2 (R. 301-02)).

Plaintiff asserts this analysis is insufficient because "he continued to require wound care

at least through February 2012 because his right foot wound would not heal," and because

he had chronic right foot drop and underlying PAD.  (Pl. Br. 13-14).  Once again,

Plaintiff attempts to turn the burden of proof on its head.  First, he does not suggest, and

the court's review of the record does not reveal, continuing functional limitations

resulting from foot drop or PAD which require a finding of disability.  The mere presence

of impairments does not require a finding of disability, and it is Plaintiff's burden to

prove disabling functional limitations.  Second, the limitations to which Plaintiff does

appeal (wound care through at least February 2012, and the need to use an assistive

6

device for ambulation through February 2012) are not continuing limitations, and even if the court were to accept that they might be disabling by themselves, they did not last for one year or result in death as is required of a disabling impairment. As the ALJ noted, the record reveals that Plaintiff's problems resulting from his PAD first required treatment and hospitalization on August 24, 2011, and, by December 21, 2011, Plaintiff stated his leg wound was healing well. (R. 302, 536-37). Thereafter, as Plaintiff points out, the record reveals that he presented to the Shawnee Mission Medical Center on February 9, 2012 complaining of a pressure ulceration of the right lateral foot. (R. 566). At that visit, they started a course of treatment and ordered a follow up in two weeks. Id. It was noted at that time that Plaintiff complained of pain and swelling associated with the ulcer, that Plaintiff was ambulatory, and that he did not use an ambulatory aid. (R. 575-76). The court notes that there is simply no record evidence that the non-healing ulcer treated on February 9, 2012 was related to Plaintiff's PAD, the ischemia of his right leg, or the treatment for it, but for the sake of argument, the court assumes that it is. Nevertheless, the evidence does not reveal that Plaintiff ever followed up on that ulcer, and there is no record evidence of any continuing problem with that or any other non-healing wound. Assuming that Plaintiff was unable to perform any substantial gainful activity because of his PAD for the entire time between August 24, 2011 and March 1, 2012 (three weeks after the February 9, 2012 treatment), that would be six months and eight days of inability to work. But, to receive SSD benefits, Plaintiff must show an inability to work for at least twelve months. 42 U.S.C. § 423(d).

Plaintiff's argument regarding his cardiac condition is similarly unsuccessful.  The ALJ summarized Plaintiff's cardiac problems and treatment, noting that he underwent quadruple coronary artery bypass surgery in March, 2008, that he did not have follow up treatment on that surgery until July 2009, and that in June 2011 he reported shortness of breath and fatigue which had lasted two months.  (R. 14).  In her RFC assessment, the ALJ noted that Plaintiff "has not had frequent follow up treatment by his cardiologist for coronary artery disease," and that at his July 2009 appointment he reported that "he had no chest discomfort when he does physical activity and no significant shortness of breath, but only felt a little tired."   (R. 17).  She noted that in December 2011 Plaintiff "reported that he has not had any chest pain suggestive of cardiac origin nor any unusual shortness of breath."  Id. (citing Ex. 14F/12 (R. 655)).  She noted that Plaintiff is "stable from a cardiovascular aspect," and that any chest pain "post stenting has been noncardiac in nature."  (R. 17) (citing Exs. 3F, 4F/12, 16, 27 (R. 262-64, 655, 659, 670)).  The records cited support the ALJ's findings.

Plaintiff claims it is error for the ALJ to find that he did not receive follow up treatment after his bypass surgery because he went to Dr. Powers two weeks later "in order to establish care."  (Pl. Br. 14).  Plaintiff also points to a letter showing that he saw a cardiologist, Dr. Meurer, on April 22, 2008 to follow up on the surgery.  Id. (citing R. 256).  In context, the ALJ's finding is based upon Plaintiff's alleged failure to follow up with a cardiologist for more than a year after the bypass surgery, as stated by Plaintiff's cardiologist, and it is that statement upon which the ALJ relied in making her finding.  (R.

8

250, 670) (dated 07/02/2009, "He has not seen a cardiologist since then [(his bypass surgery in March 2008)] and comes in for a follow-up examination").  Although it appears the ALJ's finding is technically incorrect, Plaintiff has shown no prejudice from this error.  The import of the ALJ's finding is that Plaintiff recovered well from his bypass surgery, and his cardiac condition is stable.  The record supports that finding.

Plaintiff asserts that "[v]iewed as a whole, the record does not suggest that [Mr.] Edward's cardiac condition was stable," and points to a finding of severe left ventricular hypertrophy, an estimated ejection fraction of 40%, reports of shortness of breath, an atrial flutter which delayed his skin graft in November, 2011, and malaise, fatigue, weight loss, claudication, and joint pain.  (Pl. Br. 15).  However, the records cited by Plaintiff support the ALJ's findings.  Plaintiff cites a treatment record dated November 18, 2008, but in that record, eight months after bypass surgery, Dr. Powers stated that "[t]he patient feels well with minor complaints and has good energy level."  (R. 243).  On May 26, 2009, Dr. Powers noted that the course of treatment "has been complicated by coronary artery disease," but he also summarized Plaintiff's condition as "[t]he patient feels well with no complaints, has good energy level and is sleeping well."  (R. 239).  Plaintiff cites the results of an echocardiogram on July 2, 2009 which showed severe concentric left ventricular hypertrophy and an ejection fraction of 40% (R. 674), but he fails to note that the cardiologist who ordered the test, Dr. Mehta, recognized the severe concentric left ventricular hypertrophy (R. 672), and stated that "[h]e denies any significant chest

discomfort.  He has a pretty abnormal looking EKG but no history of any chest

discomfort."  (R. 671).  The same day, Dr. Mehta wrote a letter to Dr. Powers, reporting:

> Since his bypass surgery, Mr. Edwards seems to be doing fairly well.  He
> says that he exercises on a regular basis.  He has had no chest discomfort
> when he does physical activity.  He may feel a little bit tired but usually
> does not have any significant problems with shortness of breath.

(R. 670).  Plaintiff points to a record from April 2012 which was positive for malaise,

fatigue, weight loss, claudication, shortness of breath, and joint pain, but he does not

recognize that physician's summary of Plaintiff's reported history--that Plaintiff "feels a

little tired at times.  He is not having any chest pain or any other cardiac complaints."  (R.

657).  He also ignores the physician's conclusion that "[a]t the present time, patient is

stable and asymptomatic," and that "[o]verall Derrick is doing fairly well from the cardiac

standpoint."  (R. 658-59).

 While Plaintiff points to findings in the medical evidence from which the ALJ

might have concluded that Plaintiff's cardiac condition is not stable, he ignores that the

same records were interpreted otherwise by the ALJ and they support the ALJ's

interpretation.  Moreover, Plaintiff ignores that the physicians who examined him and

prepared the medical records at issue reached the same conclusions as did the ALJ.  "The

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's findings from being supported by substantial evidence.  We may

not displace the agency's choice between two fairly conflicting views, even though the

court would justifiably have made a different choice had the matter been before it de

novo." <u>Lax v. Astrue</u>, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and bracket omitted); <u>see also</u>, <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966) (same).

It appears that Plaintiff has attempted to manufacture ambiguities or material inconsistencies in the record evidence which the ALJ did not address in her narrative discussion.  But, he has not succeeded.  The court finds no insufficiency in the ALJ's narrative discussion.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 29th day of December 2014, at Kansas City, Kansas.


s:/   John W. Lungstrum_____
**John W. Lungstrum**
**United States District Judge**